ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL II

| | | |
|---|---|---|
| ORIENTAL BANK<br><br>Apelada<br><br><br>v.<br><br><br>LUIS BOLÍVAR SANTIAGO FIGUEROA<br><br>Apelante | KLAN202400868 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Caso Núm. CA2021CV01043<br><br>Sala: 401<br><br>Sobre:<br>COBRO DE DINERO Y EJECUCIÓN DE HIPOTECA POR LA VÍA ORINARIA |

Panel integrado por su presidente, el Juez Bermúdez Torres, la Jueza Martínez Cordero y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 30 de octubre de 2024.

Comparece el señor Luis Bolívar Santos Figueroa (en adelante, parte apelante o señor Santiago Figueroa), a través del presente recurso de apelación, y nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Carolina, (en adelante, TPI), el 31 de julio de 2024 y notificada el 1 de agosto de 2024. En dicho dictamen, el TPI declaró *Con Lugar* la *Demanda* incoada por Oriental Bank (en adelante, parte apelada u Oriental) y desestimó la *Reconvención.*[1] La parte apelante presentó una *Moción de Reconsideración,*[2] que fue denegada mediante *Resolución* emitida el 19 de agosto de 2024 y notificada el 26 de agosto de 2024.[3]

Por los fundamentos que expondremos a continuación, se *confirma* el dictamen apelado.

---

[1] Apéndice 57 del Recurso de Apelación, págs. 693-727.
[2] Apéndice 58 Recurso de Apelación, págs. 728-747.
[3] Apéndice 60 Recurso de Apelación, págs, Pág. 751.

Número Identificador

SEN2024 _____

## *-I-*

El 3 de mayo de 2021, Oriental presentó una *Demanda* sobre cobro dinero y ejecución de hipoteca en contra de la parte apelante.[4] En esencia, arguyó que aproximadamente para el 26 de septiembre de 2005, el señor Santiago Figueroa suscribió un pagaré por la suma de $64,000.00 más intereses al 6.625% por ciento anual, y créditos accesorios por endoso con fecha de vencimiento al 1 de octubre de 2020. En dicha demanda, se alega que, según el pagaré suscrito entre las partes, se incluía intereses en adición a los garantizados en ley, costas y honorarios de abogado en caso de una futura reclamación judicial.

La propiedad en litigio cuenta con la siguiente descripción registral:

> ---"URBANA: Parcela de terreno identificada como solar número DIECINUEVE (19) del bloque PC de la Urbanización Parque Del Rio, situada en el Barrio Dos Bocas de Trujillo Alto, con un área de TRESCIENTOS CINCUENTA y TRES punto SETENTA y CINCO (353.75) metros cuadrados, en lindes por el NORTE, en CATORCE punto QUINCE metros con los solares número VEINTIOCHO (28) y VEINTINUEVE (29); por el Sur; en CATORCE punto QUINCE (14.15) metros, con la calle número UNO (1); por el ESTE, en VEINTICINCO (25.00) metros, con el solar número VEINTE (20); y por el OESTE, en VEINTICINCO (25.00) metros, con el solar número DIECIOCHO (18). Enclava una casa de concreto". ------------------------------------- Inscrita al folio 114 del tomo 700 de Trujillo Alto, finca #26191 del Registro de la Propiedad de San Juan, Sección Cuarta.-------------------------------------------

Oriental arguyó que, al ser el acreedor del instrumento negociable y tenedor de este, poseía el derecho para exigir el cumplimiento de este. Luego de la presentación de la demanda, surgieron varios trámites procesales, promovidos por la parte apelada, que incluyeron la paralización de los procedimientos al amparo de la oficina para la Protección Financiera del

---

[4] Apéndice 1 del Recurso de Apelación, págs. 1-32.

Consumidor, ("CFPB", por sus siglas en inglés), entre otros que no son necesarios pormenorizar aquí.[5]

Posteriormente, el 13 de abril de 2022 el señor Santiago Figueroa presentó su *Contestación a Demanda y Reconvención*.[6] En síntesis, negó la mayoría de las alegaciones, y planteó entre sus defensas, la figura de la novación. Incluyó también, una *Reconvención* contra Oriental. Entre sus aseveraciones, agregó la mala fe de la parte apelada, incluyendo el proceso obligatorio de *loss mitigation*, la alegada dificultad de información entre las partes y la imposibilidad de poder llegar a un acuerdo, ante la negativa de Oriental. Adujo entre sus reclamaciones que, Oriental incurrió en múltiples violaciones al Real Estate Settlement Procedure Act, (en adelante y por sus siglas en inglés, RESPA) 12 USC secs. 2605 (f), 2614, según se dispone en el Reglamento X, 12 CFR sec. 1024.41.

Sostuvo que, ante este suceso se vio privado de poder completar adecuadamente los procedimientos de mitigación de pérdidas y poder retener su propiedad de manera razonable. Esto, debido a la obligación que Oriental incumplió en ofrecerle una orientación diligente y razonable. Añadió también entre otros asuntos, que la parte apelada incurrió en un *Dual Tracking* y en incumplimiento de contrato. A estos fines, la parte apelante reclamó la suma de quinientos mil dólares ($500,000.00) por los daños económicos y las angustias mentales sufridas, así como daños estatutarios en una suma no menor de dos mil ($2,000.00) dólares por cada violación al RESPA y el Reglamento X.

Posterior a ello, Oriental notificó al foro de origen mediante *Moción Informativa y en Solicitud de Orden*, que no se había llevado a cabo la mediación compulsoria al amparo de la Ley Núm. 184-2012, 32 LPRA sec. 2881, según enmendada, también conocida

---

[5] Apéndice 3-8 del Recurso de Apelación, págs. 36-43
[6] Apéndice 18 del Recurso de Apelación, págs. 88-103

como Ley para Mediación Compulsoria y Preservación de tu Hogar en los Procesos de Ejecuciones de Hipotecas de una Vivienda Principal, (en adelante Ley Núm. 184-2012), por lo que solicitó que fueran remitidos al Centro de Medición de Conflictos, a tenor con la precitada ley.[7]

A tenor con la instrucción judicial, se celebraron un total de siete (7) vistas ante el Centro de Medición de Conflictos. No obstante, el 27 de diciembre de 2023, el Centro de Medición de Conflictos presentó una *Moción Informativa sobre Resultado de Caso de Ejecución de Hipoteca atendido mediante Servicio de Videoconferencia,* **en donde informó que la parte demandada no había aceptado ninguna de las alternativas propuestas**, razón por la cual se daba por concluido el proceso de mediación.[8]

El 28 de diciembre de 2023, el Foro a *quo* emitió una *Orden* a la parte demandante para que informara el curso a seguir.[9] El 8 de enero de 2024, Oriental presentó mediante *Moción en Cumplimiento de Orden* solicitando sesenta (60) días para que ambas partes completaran el descubrimiento de prueba.[10] Así las cosas, **el Tribunal emitió *Orden* notificada a las partes el 9 de enero de 2024, que se concedía  hasta el 17 de febrero del mismo año para culminar cualquier trámite pertinente al descubrimiento de prueba**, y señaló *Conferencia con Antelación a Juicio* para el 1 de mayo de 2024.[11]

No obstante, el 16 de febrero de 2024, el señor Santiago Rodríguez presentó una *Moción Informativa y Solicitando Extensión al Plazo para Completar Descubrimiento de Prueba Pendiente* en donde solicitó la extensión del descubrimiento de prueba hasta el 30 de mayo de 2024, manifestando que había notificado un *Aviso*

---

[7] Apéndice 25 del Recurso de Apelación, págs. 139-142.
[8] Apéndice 29 del Recurso de Apelación, págs. 150-152.
[9] Apéndice 30 del Recurso de Apelación, pág. 153.
[10] Apéndice 31 del Recurso de Apelación, págs. 154-156.
[11] Apéndice 32 del Recurso de Apelación, pág. 157.

*de Toma de Deposición Duces Tecum* para el 24 de abril de 2024.[12] Añadió que, tenía intención de enmendar sus alegaciones conforme a la prueba que descubriera en este período solicitado. **El TPI le concedió un término a Oriental para expresarse sobre dicho petitorio, además el TPI enfatizó que no favorecía la extensión de término**.[13] Así las cosas, la parte apelada presentó *Oposición A Moción Informativa Y Solicitando Extensión Al Plazo Para Completar Descubrimiento De Prueba Pendiente*.[14]

Ulteriormente, el señor Santiago Figueroa presentó una *Moción de Desestimación al amparo de la Ley [Núm.] 184-2012*.[15] En resumen, adujo que entre las discrepancias que existían para poder concretizar un acuerdo estaban los "foreclosure expenses" y otros "fees". En ella añadió que, Oriental nunca contestó las cartas de apelación cursadas por el señor Santiago Figueroa. Sostuvo que, obraron de mala fe en todo el proceso y que nunca le ofrecieron alternativas de mitigación, condicionando su reclamación a que desistiera de la *Reconvención* instada.

Por su parte, Oriental presentó su *Oposición a Moción de Desestimación al amparo de la Ley [Núm.] 184-2012*.[16] En resumen, argumentó que la parte apelante nunca tuvo intención real de mediar la situación. Toda vez que, a pesar de que le ofrecieron alternativas para la retención de la propiedad, el señor Santiago Figueroa no estaba de acuerdo en pagar el porcentaje que se establecía como parte de la obligación original, es decir los honorarios incurridos como parte de la presente acción judicial, es decir los de la *Reconvención*, pues la parte apelante entendía que debían limitarse al porcentaje que se desprendían del pagaré suscrito allá para el 26 de septiembre de 2005, por la parte

---

[12] Apéndice 33 del Recurso de Apelación, pág. 158-201.
[13] Apéndice 34 del Recurso de Apelación, pág. 202.
[14] Apéndice 35 del Recurso de Apelación, págs. 203-210.
[15] Apéndice 36 del Recurso de Apelación, págs. 211-219.
[16] Apéndice 38 del Recurso de Apelación, págs. 221-236

apelante. Expuso en esencia, aunque se celebraron siete (7) vistas para poder llegar a una mediación positiva para la parte apelante, y se le brindaron dos (2) opciones para la retención, este nunca tuvo intención de ceder a un acuerdo, sino más bien dilatar el procedimiento, por lo que procedía denegar dicha solicitud.

El Tribunal de Primera Instancia ordenó a Oriental mediante *Resolución* emitida, a que desglosara las partidas solicitadas que el señor Santiago Figueroa estaba objetando.[17] Sobre el petitorio del señor Santiago Figueroa referente a la Ley Núm. 184-2012, *supra*, el Foro a *quo* sostuvo que, del procedimiento incoado no se desprendía la mala fe de Oriental, y que, este último le brindó dos (2) alternativas de retención que la parte apelante había rechazado. Hizo constar en la *Resolución* expresamente que, las cantidades impugnadas por la parte apelante son a consecuencia de la acción judicial y de los gastos incurridos en la defensa de la *Reconvención.* Aclaró que, dichos gastos nada tenían que ver con el porcentaje de los gastos judiciales suscritos en el pagaré. Por lo que determinó que no procedía una desestimación al amparo de la Ley Núm. 184-2012, *supra*. El Foro de Instancia declaró *No Ha Lugar* el petitorio del señor Santiago Figueroa.

Simultáneamente, El 4 de abril de 2024, Oriental presentó una *Moción de Sentencia Sumaria*.[18] En resumen, argumentó sobre las vistas celebradas en el Centro de Mediación de Conflictos. Arguyó que, no habían hechos en controversia que impidieran dictar sentencia sumaria en el presente caso. Añadió que, las disposiciones de la RESPA y Reglamento X, así como el *Dual Tracking* no eran de aplicación al caso de marras toda vez que, el señor Santiago Figueroa no había presentado una solicitud de mitigación de pérdidas, ni estaba siendo evaluado para ello.

---

[17] Apéndice 41 del Recurso de Apelación, págs. 423-431
[18] Apéndice 40 del Recurso de Apelación, págs. 238-422.

Sostuvo además que, las alternativas ofrecidas estaban sujetas a un proceso de cualificación, y que no constituía una modificación de ninguno de los plazos y cantidades exigidas como parte de la deuda. Por lo que, no tenía defensa alguna para justificar su incumplimiento y procedía dictar sentencia sumaria a su favor. Expuso cincuenta (50) hechos esenciales sobre los que alegadamente no había controversia sustancial. Especificó que, en este caso se trataba de un contrato de préstamo hipotecario y la ejecución de deuda hipotecaria.

Es por ello que, el Foro a *quo* paralizó por un término de veinte días (20) días la solución de la moción de sentencia sumaria presentada por Oriental hasta que cumpliera con el desglose de las partidas de dinero antes mencionado.[19]

Posteriormente, la parte apelante presentó una *Moción de Reconsideración y Relevo de Orden,* esto al amparo de la Ley Núm. 184-2012, *supra.*[20] En esencia, esbozó que, el Tribunal de Primera Instancia no había tomado en cuenta sus mociones anteriores, o que había dispuesto de los asuntos, sin considerar su postura por no extender el descubrimiento de prueba. Alegó que el Tribunal actuó *ultravires* denegando una enmienda a su reconvención, que él no había presentado a esos fines. Por lo que, nuevamente solicitó extender el descubrimiento de prueba para que la parte apelante pudiera completarlo. El 23 de abril de 2024 el foro de origen declaró *No Ha Lugar la Moción de Reconsideración y Relevo de Orden.*[21] A su vez, el señor Santiago Figueroa solicitó una prórroga para poder contestar la sentencia sumaria presentada por Oriental, el Tribunal de Instancia le concedió el plazo solicitado.[22]

En el transcurso del pleito, ocurrieron otras eventualidades que no son necesarias pormenorizar aquí. El 23 de mayo de 2024,

---

[19] Apéndice 39 del Recurso de Apelación, pág. 237.
[20] Apéndice 42 del Recurso de Apelación, pág. 432-439.
[21] Apéndice 44 del Recurso de Apelación, pág. 451.
[22] Apéndice 45 del Recurso de Apelación, pág. 452.

Oriental presentó una *Moción en cumplimiento de orden.*[23] En síntesis, adujo que el desglose estaba realizado y que siempre había estado a disposición de la parte apelante, quien no había accedido a reunirse para discutirlas.

El 9 de mayo de 2024, el señor Santiago Figueroa presentó su *Oposición a la Moción de Sentencia Sumaria.*[24] Arguyó que, había controversia tanto con el pagaré, como con su legitimidad. Esbozó de manera reiterada la forma en que alegadamente, Oriental incumplió con la RESPA y el Reglamento X y que, la deuda se había extinguido el 26 de julio de 2021, por lo que el acuerdo de mitigación era académico. Sostuvo entre otros asuntos que, Oriental provocó mediante negligencia, que no pudiera obtener una carta de subordinación de "Small Business Administration", (en adelante SBA por sus siglas en inglés), para completar el proceso de mitigación de pérdidas. Por ende, Oriental incumplió el contrato entre las partes para poder retener la posesión del inmueble. También argumentó sobre la Ley Núm. 184-2012, *supra*, y la Ley Núm. 169-2016, 32 LPRA sec. 2891, también conocida como Ley de Ayuda al Deudor Hipotecario, para atacar la mala fe de las actuaciones de Oriental. Por otro lado, adujo que se había perfeccionado la figura de la novación en los casos de autos. A su vez, propuso cuarenta y tres (43) hechos alegadamente incontrovertidos y solicitó la desestimación con perjuicio.

Posteriormente, el 23 de mayo de 2024 Oriental, informó que no tenía acceso a la prueba presentada por el señor Santiago Figueroa, por este haberla clasificado de manera confidencial. Peticionó a su vez, un tiempo adicional para replicar a la oposición

---

[23] Apéndice 48 del Recurso de Apelación, págs. 457-459.
[24] Apéndice 54 del Recurso de Apelación, págs. 517-649.

una vez tuviera acceso a los documentos.[25] Emitida la correspondiente *Orden,* el 23 de mayo de 2024 Oriental presentó su *Réplica a moción en Oposición a Solicitud de Sentencia Sumaria.*[26] En síntesis, argumentó que la parte apelante no cumplió con los requisitos de la Regla 36 de Procedimiento Civil, 36 LPRA AP. V. R 36., para repeler una moción de sentencia sumaria. A su entender, rebatió los argumentos que el señor Santiago Figueroa destacó como controversiales. Evaluados los sendos escritos presentados por las partes, el Tribunal de Primera Instancia emitió una *Orden* donde indicó que, no se permitiría la presentación de más escritos y dio por sometido el caso.[27]

Evaluados los petitorios presentados por las partes, el 31 de julio de 2024 y notificado el 1 de agosto del mismo año, el TPI emitió la *Sentencia* que nos ocupa.[28] En la misma, el Tribunal desglosó las siguientes **Determinaciones de Hechos**:

1. El 26 de septiembre de 2005, el señor Luis B. Santiago Figueroa suscribió un pagaré por la suma principal de $64,000.00 más intereses a razón de 6.625 % (6 5/8 %) anual.

2. El pagaré otorgado por el señor Luis B. Santiago Figueroa el 26 de setiembre de 2005, era un Pagaré Pago Englobado ("Ballon Note") de Tasa Fija ("Fixed Rate") pagadero a su vencimiento. Esto es, el señor Luis B. Santiago Figueroa se obligó a repagar la totalidad del balance de principal y los intereses devengados y adeudados a la fecha de vencimiento.

3. Mediante el pagaré otorgado el 26 de septiembre de 2005, el señor Luis B. Santiago Figueroa se obligó a realizar pagos mensuales de principal e intereses por la cantidad de $409.80, comenzando en noviembre de 2005, con fecha de vencimiento en octubre de 2020.

4. Mediante el pagaré otorgado el 26 de septiembre de 2005, el señor Luis B. Santiago Figueroa consintió a que, ante el incumplimiento con cualquier pago mensual, el acreedor hipotecario podía cobrar un recargo por demora en la

---

[25] SUMAC Ent. 102.
[26] Apéndice 55 del Recurso de Apelación, págs. 650-691
[27] Apéndice 56 del Recurso de Apelación, pág. 692.
[28] Apéndice 57 Recurso de Apelación, págs. 697-703.

cantidad de 4% de la suma atrasada de pago, así como el cobro de otros cargos permitidos por ley.

5. Mediante el pagaré otorgado el 26 de septiembre de 2005, el señor Luis B. Santiago Figueroa consintió a que, de no realizar efectuar el pago completo de cualquier pago mensual, el acreedor hipotecario podría exigir el saldo inmediato del principal e intereses adeudados.

6. De presentarse un procedimiento judicial para el cobro del pagaré, el señor Luis B. Santiago Figueroa consintió a que el acreedor hipotecario cobrara una suma equivalente al 10% del principal para cubrir las costas, gastos y honorarios de abogado de dicho proceso.

7. En garantía del pagaré otorgado el 26 de septiembre de 2005, ese mismo día, el señor Luis B. Santiago Figueroa otorgó la Escritura Número 512 sobre Segunda Hipoteca ante el Notario Público María de Lourdes De Vizcarrondo López-Molina.

8. La propiedad dada en garantía mediante la Escritura Número 512 otorgada el 26 de septiembre de 2005, ante la Notario Público María de Lourdes De Vizcarrondo López-Molina, es la siguiente:

> ---URBANA: Parcela de terreno identificada como solar número Diecinueve (19 del bloque PC de la Urbanización Parque del Río, situada en el Barrio Dos Bocas de Trujillo Alto, con un área de TRESCIENTOS CINCUENTA Y TRES PUNTOS SETENTA Y CINCO (353.75) METROS CUADRADOS, en lindes por el NORTE, en catorce punto quince (14.15) metros con los Solares Número Veintiocho (28) y Veintinueve (29); por el SUR, en catorce punto quince (14.15) metros, con la Calle número Uno (1); por el ESTE, en veinticinco (25.00 metros, con el solar número Veinte (20); por el OESTE, en veinticinco (25.00) metros con el Solar Número Dieciocho (18).

9. Conforme la Escritura Número 512 otorgada el 26 de setiembre de 2005, el valor mínimo en la primera subasta en caso de ejecución será $64,000.00.

10. Dicha hipoteca se encuentra inscrita al folio 290 del tomo 510 de Trujillo Alto, Registro de la Propiedad de San Juan IV, finca número 26191, inscripción octava.

11. El 3 de enero de 2020, Oriental Bank remitió una comunicación con fecha de 2 de enero de 2020, al señor Luis B. Santiago Figueroa en donde le recordaba sobre el vencimiento de su préstamo ballon el 1 de enero de 2021.

12. El cambio en la fecha de vencimiento de octubre de 2020 a enero de 2021 se debió a la moratoria luego del paso del Huracán María.

13. El señor Luis B. Santiago Figueroa no realizó el pago por la totalidad del balance de principal del préstamo y los intereses devengados y adeudados al 1 de enero de 2021.

14. El 28 de enero de 2021, el señor Luis B. Santiago Figueroa comenzó un proceso de refinanciamiento con la unidad de Retail Banking para refinanciar el préstamo objeto de esta reclamación, así como otro préstamo garantizado en primer rango con la propiedad descrita en el acápite número 8 de estas determinaciones de hechos.

15. Como parte del proceso de refinanciamiento, se realizó un estudio de título sobre la propiedad que reflejó una hipoteca por la cantidad principal de $256,000.00 a favor de RG Premier Bank, una hipoteca por la cantidad principal de $64,000.00 a favor de RG Premier Bank una hipoteca por la cantidad principal de $36,900.00 a favor de Small Business Administration.

16. Como parte del proceso de refinanciamiento, la propiedad objeto de esta reclamación tasó $214,000.00, cantidad por debajo de lo que debía el demandado entre las tres (3) hipotecas que gravaban la propiedad, cantidad que ascendía a $281,168.00.

17. Debido a que la propiedad debía más de lo que había tasado, el señor Luis B. Santiago Figueroa tendría que aportar una cantidad sustancial de dinero el día del cierre.

18. El 22 de abril de 2021, la Oficial Dulce M. Pérez de Oriental Bank envió un correo electrónico al señor Luis B. Santiago Figueroa en donde le indicó que su refinanciamiento no podía tramitarse para Fannie Mae y que consultaría su caso para un préstamo Non Conforming o, de lo contrario, referirlo a mitigación de pérdidas.

19. El 27 de abril de 2021, el señor Luis B. Santiago Figueroa retiró su solicitud de refinanciamiento para poder dirigirse al área de mitigación de pérdida y verificar como podía resolver la situación de esta segunda hipoteca.

20. El 4 de mayo de 2021, un día después de haberse presentado la Demanda en ejecución de hipoteca, el señor Luis B. Santiago Figueroa comenzó un proceso de evaluación ante el Departamento de Mitigación de Pérdidas de Oriental Bank. Ese mismo día, Oriental Bank emitió una comunicación indicando que la solicitud estaba incompleta y detallando los documentos que debía entregar.

21. Surge del expediente del caso que el señor Luis B. Santiago Figueroa fue debidamente emplazado el 12 de mayo de 2021.

22. El 9 de julio de 2021, el señor Luis B. Santiago Figueroa completó su solicitud de mitigación de pérdidas ante Oriental Bank. Ese mismo día, Oriental Bank emitió una comunicación indicando que la solicitud de mitigación de pérdida estaba completa.

23. El 21 de julio de 2021, Oriental Bank notificó al señor Luis B. Santiago Figueroa lo siguiente:

> Gracias por comunicarse con nosotros en relación con su hipoteca. Basado en una revisión cautelosa de la información provista por usted, le ofrecemos la oportunidad de entrar en un Período de Prueba para una Modificación Hipotecaria. **Este es el primer paso en el proceso de cualificación para lograr pagos o términos hipotecarios más cómodos para usted. Es de suma importancia que lea esta información cuidadosamente para que pueda entender los pasos que debe llevar a cabo para completar satisfactoriamente el Período de Prueba y lograr modificar su hipoteca permanentemente.** (Énfasis suplido).

24. Mediante dicha comunicación, se le indicó al señor Luis B. Santiago Figueroa tendría hasta el 30 de julio de 2021 para la aceptación de la oferta cursada.

25. El 26 de julio de 2021, el señor Luis B. Santiago Figueroa remitió un correo electrónico en donde aceptó la oportunidad de entrar en un Período de Prueba para una Modificación hipot[e]caria.

26. El 4 de agosto de 2021, y como parte del proceso de cualificación para una Modificación Hipotecaria, un Oficial del Departamento de Mitigación de Pérdidas de Oriental Bank remitió un correo electrónico al señor Luis B. Santiago Figueroa en donde le indicó que, para someter su caso, debían recibir la carta de subordinación de parte de SBA. Como parte de dicha

comunicación se le incluyó la solicitud de subordinación, el estudio de título reciente y el teléfono de contacto de SBA.

27. Durante los meses de agosto a octubre de 2021, el oficial del Departamento de Mitigación de Pérdida de Oriental Bank le dio seguimiento al señor Luis B. Santiago Figueroa sobre la subordinación solicitada el 4 de agosto de 2021.

28. El 8 de octubre de 2021, el oficial del Departamento de Mitigación de Pérdidas de Oriental Bank remitió una comunicación al señor Luis B. Santiago Figueroa en donde se le indicó que se necesitaba información adicional para procesar su solicitud y que tenía hasta el 22 de octubre de 2021 para entregarle a Oriental Bank la carta de subordinación de SBA.

29. El señor Luis B. Santiago Figueroa nunca entregó la carta de subordinación firmada por el SBA.

30. El 27 de octubre de 2021, la Unidad de Consejería Hipotecaria del Departamento de Mitigación de Pérdida de Oriental Bank remitió una comunicación al señor Luis B. Santiago Figueroa en donde le informaba que su caso había sido cancelado por no haber entregado la carta de subordinación de SBA.

31. Posterior a la cancelación del caso, el 23 de noviembre de 2021, el señor Luis B. Santiago Figueroa remitió un correo electrónico en donde indicó que en dos (2) semana se suponía que enviaran la carta de subordinación de SBA.

32. El 1 de diciembre de 2021, el señor Luis B. Santiago Figueroa remitió, a la atención del oficial de Oriental Bank, un correo electrónico de un oficial de la SBA, fechado el 30 de noviembre de 2021, que indicaba que la solicitud que este había presentado estaba incompleta.

33. El 26 de mayo de 2023, el caso fue referido al Centro de Mediación de Conflictos, en cumplimiento con la Ley Núm. 184 de 17 de agosto de 2012.

34. **Como parte del proceso de mediación, la parte demandante ofreció a la parte demandada dos (2) alternativas para retener la propiedad. La parte demandada no aceptó las alternativas aprobadas**. (Énfasis suplido).

35. Ante el rechazo libre y voluntario de la parte demandada a las alternativas aprobadas, dimos por cumplido el requisito jurisdiccional que establece la Ley 184-20[12].

36. Oriental Bank es el tenedor del pagaré objeto de la presente reclamación.

37. Al 3 de abril de 2024, la parte demandada adeuda a Oriental la cantidad de $46,825.37 de principal, más intereses sobre dicha suma al tipo de 6.625% por ciento anual desde el día 1 de diciembre de 2020, hasta su completo pago, más costas, recargos, cargos acumulados, gastos y honorarios de abogado, para un total adeudado a esa fecha de $84,503.26.

38. Todas estas sumas son líquidas, están vencidas y son exigibles.

Así las cosas, el TPI declaró *Ha Lugar* la *Moción de Sentencia Sumaria* presentada por Oriental Bank y, en su consecuencia, declaró *Con Lugar* la demanda.[29] Consecuentemente, desestimó la *Reconvención* presentada con perjuicio. La parte apelante presentó *Moción de Reconsideración*, la cual fue declarada sin lugar el 26 de agosto de 2024.[30] Inconforme con tal determinación, la parte apelante presentó el recurso ante nos y le imputó al TPI la comisión de los siguientes errores:

> PRIMER ERROR: "Erró el TPI al dictar sentencia sumaria haciendo caso omiso de la prueba documental y testifical no refutada que establece que la parte apelada instó la Demanda de ejecución de hipoteca en violación a la *Real Estate Settlement Procedures Act*, el Reglamento X (Regulation X) y la "Ley de Ayuda al Deudor Hipotecario", Ley Núm. 169 de 2016".

> SEGUNDO ERROR: "Erró el TPI al dictar sentencia sumaria declarando con lugar una demanda en la que se reclama una obligación que fue objeto de novación mediante un acuerdo de mitigación de pérdida perfeccionado el 26 de julio de 2021".

> TERCER ERROR: "Erró el TPI al emitir sentencia sumaria declarando con lugar una demanda a pesar de que existen múltiples hechos controvertidos sobre el vencimiento, exigibilidad y cuantía de la suma reclamada en la demanda".

Con el beneficio de la comparecencia de ambas partes, procedemos a exponer el derecho aplicable.

---

[29] Apéndice 57 del Recurso de Apelación, págs. 693-727.
[30] Apéndice 58 del Recurso de Apelación, págs.728-747.

**-II-**

**-A-**

La sentencia sumaria es un mecanismo procesal que tiene como propósito la solución, justa, rápida y económica de los litigios civiles que no contengan controversias genuinas de hechos materiales y que, por lo tanto, no ameritan la celebración de un juicio en su fondo. *Segarra Rivera v. International Shipping Agency, Inc.*, 208 DPR 964, 979 (2022). Como es sabido, en nuestro ordenamiento jurídico, el mecanismo de la sentencia sumaria está regido por la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, la cual desglosa los requisitos específicos con los que debe cumplir esta figura procesal. *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 224 (2015). La sentencia sumaria es un mecanismo procesal disponible en nuestro ordenamiento que nos permite resolver controversias sin que se requiera llegar a la etapa de juicio. *Birriel Colón v. Econo y Otros*, 2023 TSPR 120, 213 DPR ___ (2023); González *Meléndez v. Mun. San Juan*, 212 DPR 601, 610 (2023); *Segarra Rivera v. Int'l Shipping et al.*, 208 DPR 964, 979 (2022); *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010).

La Regla 36.1 de Procedimiento Civil establece que las partes podrán presentar una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada. 32 LPRA Ap. V, R. 36.1. La sentencia sumaria es una excepción al juicio mediante testimonios vivos frente al juzgador de los hechos. *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013). La parte que solicita la sentencia sumaria tiene la responsabilidad de demostrar de manera clara que el promovido no puede prevalecer mediante ningún supuesto de hechos y que el tribunal cuenta con

la verdad sobre todos los hechos necesarios para resolver la controversia ante su consideración. *Id.* pág. 473

Por su parte, el Tribunal tiene discreción para conceder o no la sentencia sumaria, ya que el mal uso de esta puede despojar a un litigante de su día en corte, lo cual coartaría su debido proceso de ley. *Roig Com. Bank v. Rosario Cirino*, 126 DPR 613, 617 (1990). Es por lo anterior, que no es aconsejable que se utilice el mecanismo de sentencia sumaria cuando hay elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor de credibilidad sea esencial para dilucidar la controversia que deban ser evaluados por el juzgador. *Segarra Rivera v. International Shipping Agency, Inc.*, *supra*, pág. 980. **No obstante, el Tribunal puede utilizar el mecanismo de sentencia sumaria, aun cuando hay elementos subjetivos, si la evidencia que será considerada en la solicitud surge que no existe controversia en cuanto a los hechos materiales.** *Cruz Cruz v. Casa Bella Corp.,* 2024 TSPR 47, 213 DPR ___ (2024); *SLG Zapata-Rivera v. J.F. Montalvo*, *supra*, pág. 442-443. (Énfasis suplido)

Ahora bien, antes de utilizar el mecanismo de sentencia sumaria, el Tribunal debe evaluar lo siguiente:

> (1) analizará los documentos que acompañan la moción solicitando la sentencia sumaria y los documentos incluidos con la moción en oposición y aquellos que obren en el expediente del tribunal; (2) determinará si el oponente controvirtió algún hecho material o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. *Management Administration Services, Corp v. ELA*, 152 DPR 599, 611 (2000).

En síntesis, el Tribunal de Primera Instancia no podrá dictar sentencia sumaria cuando: "(1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no ha sido refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia

real sobre hecho material y esencial, o (4) como cuestión de derecho no proceda". *Fernández Martínez v. RAD-MAN San Juan III-D, LLC.*, 208 DPR 310, 335 (2021).

Asimismo, si la otra parte desea derrotar una moción de sentencia sumaria, deberá presentar declaraciones juradas y documentos que pongan en controversia los hechos presentados por el promovente. *PFZ Props, Inc v Gen, Acc Ins. Co.*, 136 DPR 881, 912-913 (1994). No obstante, el solo hecho de no presentar evidencia que controvierta la presentada por el promovente, no implica necesariamente que procede la sentencia sumaria. *Id.*, pág. 913. Los jueces no están constreñidos por los hechos o documentos evidenciarios que se aduzcan en la solicitud de sentencia sumaria, sino que tienen el deber de considerar todos los documentos en autos, incluso aquella que no haya formado parte de la solicitud, sin dirimir cuestiones de credibilidad. *Vera v. Dr. Bravo*, 161 DPR 308, 333 (2004).

En cuanto al estándar de revisión aplicable al Tribunal de Apelaciones al momento de revisar la determinación del foro primario de conceder o denegar la sentencia sumaria, el foro intermedio apelativo solo puede:

> (1) considerar los documentos que se presentaron ante el foro primario —cual implica que, en apelación los litigantes no pueden añadir prueba que no fue presentada oportunamente ante el foro primario, ni esbozar nuevas teorías—, (2) determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y (3) determinar si el derecho se aplicó de forma correcta. *Segarra Rivera v. International Shipping Agency, Inc., supra,* pág. 981.

Por utilizar los mismos criterios de evaluación, los foros apelativos se encuentran en la misma posición que el tribunal de instancia. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 116 (2015). Ahora bien, el Tribunal Supremo estableció que el

estándar a seguir para revisar la denegatoria o concesión de una moción de sentencia sumaria es el siguiente:

> (1) que el Tribunal de Apelaciones se encuentre en la misma posición del Tribunal de Primera Instancia al momento de revisar solicitudes de sentencia sumaria, y que esta revisión sea *de novo*;
> (2) que el Tribunal de Apelaciones revise que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en las Reglas de Procedimiento Civil;
>
> (3) que el Tribunal de Apelaciones revise si en realidad existen hechos materiales en controversia y si existen debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y
>
> (4) si los hechos materiales realmente son incontrovertidos, el foro apelativo intermedio procederá entonces a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho en la controversia. *Segarra Rivera v. International Shipping Agency, Inc., supra*, pág. 982.

En armonía con lo anterior, la revisión del foro apelativo conlleva examinar *de novo* el expediente de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria en el tribunal de instancia y realizando todas las inferencias permisibles a su favor. *Birriel Colón v. Supermercados Los Colobos, supra.*

El Tribunal Supremo de Puerto Rico ha reiterado que "[t]oda vez que la moción de sentencia sumaria evita la celebración de un juicio, las deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas, si las hubiese, presentados por las partes en apoyo de su contención, deben admitirse en evidencia en un juicio plenario". *Carpets & Rugs v. Tropical Reps*, 175 DPR 615,637 (2009); *Jusino et als. v. Walgreens*, 155 DPR 560, 577 (2001).

### -B-

### i.

En Puerto Rico, la Ley Núm. 169-2016, *supra,* se aprobó con el propósito de adoptar las disposiciones de la Reglamentación X,[31] y permitir que las alegaciones en torno a su incumplimiento puedan presentarse dentro de los foros locales, y no ante el *Consumer Financial Protection Bureau* (por sus siglas en inglés, en adelante, CFPB).[32] Así, expresamente establece que:

> La presente Ley evitará que circunstancias que expongan al deudor a situaciones injustas se concreticen. Esto porque el acreedor hipotecario **no podrá comenzar ningún proceso de demanda en cobro dinero hasta tanto y en cuanto el proceso de evaluación de mitigación de pérdidas haya terminado.** Una vez se cumpla con las disposiciones de esta Ley, el acreedor hipotecario deberá detener cualquier gestión legal y brindar asesoría de buena fe, asistiendo al deudor en su solicitud, una vez exprese su intención respecto al proceso de mitigación y se complete el proceso de presentación de solicitud de mitigación de pérdidas. *Íd.* (Énfasis suplido).

Surge de lo anterior, que la legislación local también exige ofrecer al deudor hipotecario la alternativa de mitigación de pérdidas, e incluso brinda una protección mayor que la ley federal. *Íd.* En virtud de ello, sólo tras concluir con el proceso de mitigación de pérdidas se podrá comenzar un proceso legal ante los tribunales de Puerto Rico. 32 LPRA sec. 2893. Además, se dispone en su artículo cuatro (4) que:

> Será responsabilidad del acreedor hipotecario orientar al deudor hipotecario de las alternativas de mitigación de pérdidas que tiene disponible tanto a nivel federal como local. También debe asistir al deudor en el proceso de cumplimentar la solicitud de mitigación de pérdidas, de buena fe y cumpliendo siempre con los parámetros federales y locales pertinentes. A tales efectos, durante el proceso de mitigación de pérdidas, el acreedor hipotecario no podrá negarse a aceptar pagos parciales a la deuda. 32 LPRA sec. 2894.

---

[31] La designación de la Sección 1024.1 hacia el "Reglamento X" fue emitida por la Oficina de Protección Financiera del Consumidor para implementar la Ley de Procedimientos de Liquidación de Bienes Raíces de 1972, según enmendada. 12 USC 2601 *et. seq.*

[32] *Exposición de Motivos* de la Ley Núm. 169-2016.

**En caso de que ya se hubiera iniciado un proceso judicial, y siempre que no exista una sentencia final y firme, dicho proceso se detendrá.** Sobre el particular, expresamente se dispone lo siguiente:

> En el caso en que ya haya comenzado un proceso legal de cobro de dinero y ejecución hipotecaria, **y el deudor hipotecario haya entregado el formulario solicitando mitigación de pérdidas y sometido los documentos requeridos para la evaluación de su caso el proceso legal deberá detenerse, según las disposiciones del Reglamento X, mientras se culmina el proceso de cualificación del deudor hipotecario y éste adviene en conocimiento de que cualifica o no**... *Íd.* (Énfasis suplido).

La evaluación en cuestión no debe ser un mero formalismo, sino cumplir con los procesos dispuestos en la Reglamentación X. 32 LPRA sec. 2895. **Así, el proceso legal de cobro de dinero y ejecución de hipoteca sólo podrá comenzar siempre y cuando se haya terminado la evaluación, la cual debe ser una que haya respetado los "derechos del deudor ya establecidos en la Regulación X para poder apelar cualquier decisión".** *Íd.* (Énfasis suplido).

### *ii.*

La Ley Núm. 184-2012, *supra*, tiene como objetivo, al igual que la legislación promulgada por el Gobierno Federal:

> [...]debe colaborar y buscar alternativas que logren disminuir los procesos de ejecución de hipotecas y evitar al máximo posible que nuestros ciudadanos sigan perdiendo sus propiedades. La realidad es que estas alternativas existen y el público las desconoce. En los Estados Unidos de América nueve Estados han aprobado estos procesos de mediación ante los tribunales de justicia o mediante procesos no judiciales compulsorios con el propósito de buscar y evitar tener que llevar a cabo un proceso de ejecución de hipoteca por parte del banco o institución crediticia.[33]

---

[33] Ley Núm. 184-2012, según enmendada, *Exposición de Motivos*.

Como parte de las definiciones incluidas en la Ley Núm. 184-2012, *supra,* se establece una serie de definiciones, donde destacamos:

> (**b) Mediación Compulsoria:** En los casos en que un acreedor hipotecario pueda iniciar un proceso de ejecución de hipoteca, o el cual pueda culminar en la venta judicial, de una propiedad residencial que constituya una vivienda principal, se celebrará una reunión compulsoria de mediación conducida en una sala o salón del Tribunal o en aquel lugar que las partes en acuerdo con el mediador seleccionen, pero que no podrá ser en las oficinas del acreedor hipotecario o de sus abogados o representantes legales o asesores, y presidida por un mediador seleccionado por las partes, en el curso de un procedimiento de ejecución de hipoteca sumario y/o ordinario. **En dicha reunión el acreedor hipotecario notificará al deudor hipotecario todas las alternativas disponibles en el mercado para poder evitar la ejecución de la hipoteca o la venta judicial de una propiedad residencial que constituya una vivienda principal**. **El propósito u objetivo será poder llegar a un acuerdo o modificación que permita al deudor hipotecario establecer un acuerdo de pago u otra alternativa satisfactoria a las partes y no perder su vivienda principal.**32 LPRA sec. 2881 (b). (Énfasis suplido).

Nótese, además, que en el artículo 3 de la precitada ley, se establece:

> […] **En dicha vista o acto de mediación, el acreedor hipotecario entregará al deudor hipotecario, una lista de los documentos necesarios y pendientes, si alguno, para evaluar la(s) alternativa(s) que puedan ser aplicables al caso del deudor hipotecario, quien entregará los documentos solicitados en un tiempo razonable, cumpliendo con la reglamentación federal aplicable.** Antes de la siguiente vista o acto de mediación correspondiente, deberá entregar los documentos solicitados en una primera vista, **o en su defecto, evidencia de que está haciendo las gestiones para obtener los referidos documentos**. <u>**Si el deudor hipotecario incumple con su obligación de someter los documentos solicitados, dentro de un tiempo razonable y sin justa causa, se entenderá que ha desistido del proceso de mediación compulsoria, y en tal caso, el Tribunal continuará el proceso judicial iniciado por el acreedor hipotecario**</u>. El incumplimiento de cualquiera de las partes a producir documentos para la primera sesión no será motivo para terminar la mediación. **El representante del acreedor o inversionista le informará al deudor para cuales de las alternativas cualifica y se le explicarán las razones para no estar disponibles las alternativas**

**para las que no cualifique**. 32 LPRA sec. 2882. (Énfasis suplido).

### iii.

El Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020, 31 LPRA sec. 5311, (en adelante Código Civil), define la hipoteca como un derecho real de garantía que puede constituirse sobre bienes inmuebles que continúan en poder del deudor o de un tercero, para asegurar toda clase de obligaciones. 31 LPRA sec. 8731. Para que la hipoteca quede válidamente constituida es indispensable que el instrumento en que se constituya se inscriba en el Registro de la Propiedad, excepto cuando la ley la reconoce como tácita. 31 LPRA sec. 8734. El crédito hipotecario puede enajenarse o cederse a un tercero en todo o en parte, con las formalidades exigidas por la ley. 31 LPRA sec. 8735.

Nuestro máximo Foro Judicial ha establecido que "[l]a hipoteca es un derecho real que sujeta o vincula lo hipotecado a que eventualmente su titular pueda exigir la realización de su valor, así como tomar medidas para salvaguardarlo, en seguridad o garantía de la efectividad de alguna obligación dineraria" *Bco. Popular v. Registrador*, 181 DPR 663, 673 (2011).

De igual forma, el Tribunal Supremo de Puerto Rico ha reiterado que:

> [E]stablecida que la constitución de las hipotecas depende de varios requisitos esenciales, a saber: (1) que se establezca para asegurar el cumplimiento de una obligación principal; (2) que la cosa hipotecada pertenezca en propiedad a la persona que la hipoteca, y (3) que las personas que constituyan la hipoteca tengan libre disposición de sus bienes o, en caso de no tenerla, se hallen legalmente autorizados al efecto. *Dist. Unidos de Gas v. Sucn. Declet Jiménez,* 196 DPR 96, 110 (2016).[34]

---

[34] Dichos requisitos conformaban el artículo 1756 del hoy derogado Código Civil de 1930, 31 LPRA sec. 5001. No obstante, las jurisprudencia continua vigente y las disposiciones relacionadas a la ejecución hipotecaria se rigen por la Ley Núm. 210-2015, 30 LPRA sec. 6018.

Así las cosas, es necesario concluir que "la hipoteca se define por ser "de carácter accesorio, indivisible, de constitución registral, y grava bienes inmuebles, ajenos y enajenables, que permanecen en posesión de su propietario o titular ...". *Bco. Popular v. Registrador*, supra, pág. 673. **Es por ello, debido a su carácter accesorio, la hipoteca no es independiente de la vigencia de la obligación principal**. *Westerbank v. Registradora*, 174 DPR 779, 784 (2008). (Énfasis suplido). En otras palabras, "**la hipoteca subsiste mientras tenga vigencia el crédito garantizado, por lo que se extingue en todo caso que se extinga la obligación principal que garantiza**". *Íd.* (Énfasis suplido).

### *iv.*

Con el objetivo de implementar el *Real Estate Settlement Procedures Act* (RESPA), 12 USC 2601, *et seq.*, la agencia federal *Consumer Financial Protection Bureau* promulgó la Reglamentación X o *Regulation X* (12 CFR sec. 1024.1, *et seq.*).[35] El 10 de enero de 2014 se enmendaron varias disposiciones de la Reglamentación X, entre las cuales destaca la prohibición a los bancos de mantener acciones paralelas o simultáneas (*dual tracking)* contra los deudores. 12 CFR 1024.41 (f). Dichas enmiendas regulan detalladamente la presentación y evaluación de las solicitudes de mitigación de pérdidas en las entidades bancarias o financieras, que como agentes brindan servicios y administran (*servicers*) los préstamos garantizados con una hipoteca sobre los inmuebles que constituyen la residencia principal de los deudores hipotecarios.

---

[35] En el 2010, el Congreso de los Estados Unidos aprobó el "*Dodd-Frank Wall Street Reform and Consumer Protection Act*", PL 111-203, 12 USC sec. 5301, *et seq.*, con el propósito, entre otros, de promover la estabilidad financiera mediante el fomento de la responsabilidad y la transparencia del sistema financiero. A esos fines se creó el CFPB, un organismo administrativo del gobierno federal al que se le otorgó la autoridad de regular todos los asuntos relativos a la protección de los consumidores en el sector financiero. Como parte de dicha autoridad general delegada, el CFPB reglamenta y procura el cumplimiento de las disposiciones de la legislación RESPA.

Se entiende por "*dual tracking*" **la práctica de un agente o acreedor hipotecario de evaluar una solicitud completa de manejo de pérdida y, al mismo tiempo, iniciar, solicitar o continuar un procedimiento de ejecución ante un foro judicial**. Esta prohibición va dirigida a impedir dos situaciones en particular. La primera, que se inicie una acción de ejecución de hipoteca (foreclosure), mientras se está evaluando una solicitud de mitigación de pérdidas. La segunda, que el Banco continúe con la acción de ejecución de hipoteca al mismo tiempo que evalúa una solicitud de mitigación.

Bajo el primer escenario, la norma dispone que una entidad bancaria no puede emplazar al deudor notificándole de una demanda en su contra hasta que emita la decisión final sobre la solicitud; es decir, que la determinación no esté sujeta a apelación. 12 CFR 1024.41(f). El segundo escenario prohibido ocurre cuando la solicitud de mitigación de pérdidas se presenta después de haber comenzado una reclamación. En particular, la referida Reglamentación establece lo siguiente:

> (g) *Prohibition on foreclosure sale.* **If a borrower submits a complete loss mitigation application** after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, **a servicer shall not move for foreclosure judgment or order of sale, or conduct a foreclosure sale**, **unless:**
>
> (1) The servicer has sent the borrower a notice pursuant to paragraph (c)(1)(ii) of this section that the borrower **is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied**;
>
> (2) The borrower rejects all loss mitigation options offered by the servicer; or

(3) The borrower fails to perform under an agreement on a loss mitigation option.

12 CFR sec. 1024.41 (g) (1) (2) (3). (Énfasis suplido).

Surge de lo anterior que, si luego de haberse iniciado una acción de ejecución de hipoteca, el deudor somete una solicitud de mitigación de pérdidas válida, el agente o acreedor hipotecario está vedado de solicitar la ejecución de la sentencia o realizar una subasta para la venta del inmueble. **Ello, siempre que no se configure alguna de las situaciones antes reseñadas; esto es, que el deudor: 1) no es elegible para el proceso de mitigación de pérdidas, 2) rechaza las opciones de mitigación de pérdidas, o 3) incumple con los acuerdos alcanzados en el proceso de mitigación de pérdidas.**[36] (Énfasis suplido).

Para que un acreedor o agente hipotecario pueda evaluar una solicitud de mitigación de pérdidas, **esta deberá estar completa.**[37] 12 CFR sec. 1024.41 (b)(1). La reglamentación dispone que cuando un deudor presenta una solicitud de mitigación de pérdidas incompleta, el acreedor hipotecario deberá

---

[36] La referida Reglamentación provee también para un proceso de apelación, que dispone lo siguiente:

"(1) Appeal process required for loan modification denials. If a servicer receives a complete loss mitigation application 90 day or more before a foreclosure sale or during the period set forth in paragraph (f) of this section, a servicer shall permit a borrower to appeal the servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program available to the borrower.

(2) Deadlines. A servicer shall permit a borrower to make an appeal within 14 days after the servicer provides the offer of a loss mitigation option to the borrower pursuant to paragraph (c)(1)(ii) of this section.

(3) Independent evaluation. An appeal shall be reviewed by different personnel than those responsible for evaluating the borrower's complete loss mitigation application.

 (4) Appeal determination. Within 30 days of a borrower making an appeal, the servicer shall provide a notice to the borrower stating the servicer's determination of whether the servicer will offer the borrower a loss mitigation option based upon the appeal and, if applicable, how long the borrower has to accept or reject such an offer or a prior offer of a loss mitigation option. A servicer may require that a borrower accept or reject an offer of a loss mitigation option after an appeal no earlier than 14 days after the servicer provides the notice to a borrower. A servicer's determination under this paragraph is not subject to any further appeal." Véase 12 CFR §1024.41 (h).

[37] La Reglamentación X define la "complete loss mitigation application" de la siguiente manera: "A complete loss mitigation application means an application in connection with which a servicer has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower. A servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application".

notificarle al deudor, dentro de un período de cinco días, si la solicitud está completa o incompleta. 12 CFR sec. 1024.41 (b)(2)(i)(B).

Si el deudor sometió todos los documentos solicitados, la solicitud deberá ser considerada *"facially complete"*. Ante esa situación, si el acreedor luego descubre la necesidad de información adicional o de correcciones a documentos previamente sometidos para completar la solicitud, el acreedor deberá: (1) requerirle al deudor la información que falte o los documentos con las correcciones pertinentes; (2) tratar la solicitud como si estuviese completada hasta tanto el deudor se le haya brindado una oportunidad razonable para completar la solicitud. 12 CFR sec. 1024.41 (c)(2)(iv). Toda denegatoria a una solicitud de modificación del préstamo en consideración debe contener las razones específicas que motivaron el rechazo, y permitir al deudor apelar la decisión ante los ejecutivos del banco. *Id.* sec. 1024.41 (d)(e).

Es menester destacar que el acreedor o agente hipotecario no está obligado a proveer una opción de mitigación específica. *Id.* sec.10.24 41 (a). La Reglamentación X también permite ofrecer una opción de mitigación de pérdida sin que la solicitud esté completa cuando el ofrecimiento no está basado en evaluación alguna de la información sometida en relación con la solicitud. Por otro lado, exige a la institución financiera brindar una oportunidad razonable (*reasonable opportunity*) para completar la solicitud. *Id.* sec. 1024.41 (c)(a)(iv).

Así, es requisito notificar al deudor sobre cuál es la información adicional o documento corregido que se requiere, además de brindarle suficiente tiempo para recopilar la información o la documentación necesaria para completar la solicitud. La cantidad de tiempo que se estima razonable dependerá de los hechos y las

circunstancias de cada caso. *Íd.* A estos efectos la sección 1024.41(c)(3)(e) del Reglamento X dispone expresamente lo siguiente;

> *That the servicer may need additional information at a later date to evaluate the application, in which case the servicer will request that information from the borrower and give the borrower a reasonable opportunity to submit it, the evaluation process may take longer, and the foreclosure protections could end if the servicer does not receive the information as requested.*

El Reglamento X obliga al *servicer*, aquella entidad encargada de manejar los trámites administrativos relativos al préstamo, a tener políticas y procedimientos razonablemente diseñados para poder cumplir con varios objetivos, entre ellos, proveer información precisa y oportuna a los deudores, según éstos la soliciten o lo requiera la ley y reglamentos aplicables 12 CFR 1024.38 (a) y (b) (1) respectivamente. Esas políticas y procedimientos deben estar también diseñadas para asegurar que el *servicer* pueda evaluar apropiadamente las solicitudes de mitigación de pérdidas, o *loss mitigation*, conforme a lo siguiente;

(i) Provide accurate information regarding loss mitigation options available to a borrower from the owner to assignee of the borrower's mortgage loan;

(ii) Identify with specificity all loss mitigation options for which borrowers may be eligible pursuant to any requirements established by an owner or assignee of the borrower's mortgage loan;

(iii) Provide prompt access to all documents and information submitted by a borrower in connection with a loss mitigation option to servicer personnel that are assigned to assist the borrower pursuant to § 1024.40.

(iv) Identify documents and information that a borrow is required to submit to complete a loss mitigation application and facilitate compliance with the notice required to § 1024.41(b)(2)(i)(B); and

(v) Properly evaluate a borrower who submits and application for a loss mitigation option for all loss mitigation options for which the borrower may be eligible pursuant to any requirements established by the owner or assignee of the borrower's mortgage loan and, where applicable, in accordance with the requirements of § 10.24.41. 12 C.F.R. 1024.38(b)(2)

El Reglamento X en su sección 1024.41(f) prohíbe comenzar o continuar cualquier proceso judicial de ejecución de hipotecas. Particularmente la sección 1024.41 (f) (2) dispone que **no se puede comenzar procesos de ejecución a menos que el agente hipotecario notifique al deudor que ya no es elegible para ninguna de las alternativas de mitigación de pérdidas y no tiene derecho a ejercer ningún tipo de apelación**. Dispone expresamente la sección 1024.41 (f) (2):

> (2) *Application received before foreclosure referral.* If a borrower submits a complete loss mitigation application during the pre-foreclosure review period set forth in paragraph (f)(1) of this section or before a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, a servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:
>
> > (i) The servicer has sent the borrower a notice pursuant to paragraph (c)(l)(ii) of this section that the borrower is not eligible for any loss mitigation option and the appeal process in paragraph (h) of this section is not applicable the borrower has not requested an appeal within the applicable time period for requesting appeal, or the borrower's appeal has been denied.
> >
> > (ii) The borrower rejects all loss mitigation options offered by the servicer; or
> >
> > (iii) The borrower fails to perform under an agreement on a loss mitigation option.

### -C-

Es pilar fundamental de nuestro acervo contractual puertorriqueño el principio de la libertad de contratación. *Arthur Young & Co. v. Vega III,* 136 DPR 157, 169 (1994). A base de éste, las partes contratantes pueden establecer las condiciones que tengan por conveniente, siempre que éstas no sean contrarias a la ley, a la moral o a las buenas costumbres. 31 LPRA sec. 6242. Así, se posibilita que las partes puedan contratar cuando quieran, como quieran y con quien quieran. J. Puig Brutau, *Fundamentos*

*de Derecho Civil: Doctrina General del Contrato,* 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. I, pág. 5.

Es norma sólidamente establecida en nuestra jurisdicción que el contrato tiene fuerza de ley entre las partes, por lo que desde el momento de su perfeccionamiento cada contratante debe actuar de buena fe en el cumplimiento de su obligación. 31 LPRA sec. 9754 y 31 LPRA sec. 8983; *Cruz Cruz v. Casa Bella Corp., supra.* Es por ello que, existe un contrato desde que dos o más partes expresan su consentimiento en la forma prevista por la ley, para crear, regular, modificar o extinguir obligaciones. 31 LPRA sec. 9751.

En ese sentido, un contrato es vinculante desde que concurren los siguientes requisitos: (1) consentimiento de los contratantes; (2) objeto determinable y (3) causa lícita. 31 LPRA 6131 y 31 LPRA sec. 6142; *Cruz Cruz v. Casa Bella Corp., supra,* pág. 15. Consecuentemente, "cuando la ley no designa una forma para la realización de un negocio jurídico, se puede utilizar aquella que se considere conveniente". 31 LPRA sec. 6161.

Ahora bien, **en los contratos con prestaciones recíprocas se encuentra implícita la facultad de resolver el contrato por falta de cumplimiento con una obligación principal.** 31 LPRA sec. 9823. (Énfasis suplido). Esto es, el perjudicado puede reclamar el cumplimiento del contrato o la resolución de la obligación con el resarcimiento de los daños causados. *Íd.* **El incumplimiento de una obligación recíproca conlleva un efecto resolutorio siempre que la obligación incumplida sea una esencial o que su cumplimento constituya el motivo del contrato para la otra parte**. *NECA Mortg. Corp. v. A&W Dev. S.E.,* 137 DPR 860, 875 (1995). (Énfasis suplido).

Así, nuestro más alto foro ha expresado que:

La exigencia de que la obligación incumplida sea la principal responde a un interés superior, acorde con el principio de la buena fe, de evitar el abuso en el ejercicio de las acciones resolutorias, promover el cumplimiento de los contratos e impedir que, a través de una infracción menor, una de las partes trate de liberarse del vínculo porque ya no le conviene o no le interesa. Los tribunales deberán tener bien presente que el Art. 1077 del Código Civil, *supra*, dispone que el tribunal decretará la resolución si no existen causas justificadas que le autoricen para señalar un plazo. *Íd.,* págs. 875-876 (cita omitida).

En materia contractual, es norma conocida que, si los términos de un negocio jurídico bilateral son claros y no dejan duda sobre la intención de las partes, no cabe recurrir a reglas de interpretación, por lo que se estará al sentido literal de sus palabras. 31 LPRA sec. 6342; *Cruz Cruz v. Casa Bella Corp.*, *supra*. De conformidad con dicha norma interpretativa, nuestro Tribunal Supremo ha reconocido que cuando los términos de un contrato, sus condiciones y sus exclusiones son claros y específicos, y no dan margen a ambigüedades o diferentes interpretaciones, así deben aplicarse. *San Luis Center Apts. et al. v. Triple-S*, 208 DPR 824, 832 (2022); *Rivera Rodríguez v. Rivera Reyes*, 168 DPR 193, 212 (2006). Esto es, se debe seguir y honrar la letra clara del acuerdo cuando la misma demuestra inequívocamente la voluntad de los contratantes. *Cruz Cruz v. Casa Bella Corp.*, *supra*.

No obstante, cuando de la lectura del texto, las cláusulas no son claras o no permiten una comprensión única de lo acordado, los tribunales estamos llamados a interpretar el contrato partiendo de la verdadera y común intención de las partes. *Merle v. West Bend Co.,* 97 DPR 403, 409-410 (1969). Igualmente, se debe presuponer la "lealtad, corrección y buena fe en su redacción, e interpretarlo de manera tal que lleve a resultados conformes a la relación contractual y que estén de acuerdo con las normas éticas". *SLG Irizarry v. SLG García,* 155 DPR 713, 726 (2001).

Partiendo de esta premisa, al momento de interpretar el contrato y establecer cuál es la intención de las partes, debemos recurrir a las normas de hermenéutica contractual establecidas en los Artículos 353 al 358 del Código Civil, *supra*, 31 LPRA secs. 6341-6346. En lo específico a la controversia ante nos, el Código Civil establece que, si hay duda sobre la eficacia del negocio jurídico, debe interpretarse de modo que produzca efectos". 31 LPRA sec. 6341. Así pues, si el negocio jurídico es bilateral, la disposición ambigua debe interpretarse en sentido desfavorable a quien la redactó y en favor de la parte que tuvo menor poder de negociación. 31 LPRA sec. 6346. Por otro lado, las cláusulas del contrato se interpretarán "las unas por medio de las otras, ya pertenezcan al mismo negocio jurídico, ya a negocios jurídicos conexos, y mediante la atribución del sentido apropiado al conjunto". 31 LPRA sec. 6344. Es decir, se analizarán en su totalidad, con el propósito de entender su verdadero significado. *CNA Casualty of P.R. v. Torres Díaz*, 141 DPR 27, 39 (1996).

*-D-*

El Artículo 1182 del Código Civil, define la novación como la sustitución de una obligación previa por una nueva, la cual extingue la primera. 31 LPRA sec. 9421. La novación se puede llevar a cabo mediante la variación del objeto o condiciones principales de una obligación, sustituyendo la persona del deudor por otro, o la sustitución del antiguo acreedor por otro. 31 LPRA sec. 9422.

En lo pertinente al caso ante nos, el profesor Garay Aubán puntualiza que para que una obligación quede extinguida por otra que la sustituya, es **indispensable** que ocurra una de dos cosas: **(1) que así se declare expresamente o; (2) que, aunque las partes no lo hayan declarado, la obligación original y la nueva,**

**sean totalmente incompatibles entre sí**. 31 LPRA sec. 9423. "Fíjense en el uso del lenguaje en este artículo: los términos son absolutos (**'terminantemente', 'totalmente'**)". M. GARAY AUBÁN, COMPENDIO DE OBLIGACIONES, INCLUYE REFERENCIAS AL CÓDIGO CIVIL 2020, 206 (2023). (Énfasis suplido).

El Tribunal Supremo de Puerto Rico ha reiterado que "**no existe novación extintiva cuando se confieran facilidades para el cumplimiento de la obligación primitiva como, por ejemplo, cuando se conceden prórrogas o plazos fraccionados, salvo que el plazo sea una condición esencial en cuyo caso se entraría en el ámbito de la novación por incompatibilidad**". *PDCM Assoc. v. Najul Bez,* 174 DPR 716, 726(2008); citando a *Miranda Soto v. Mena Eró* 109 DPR 473, 479-480 (1980). (Énfasis suplido).

Nuestro máximo foro judicial ha expresado que "**la novación nunca se presume, sino que ha de ser acreditada sin género alguno de duda**." *González v. Sucn. Cruz,* 163 DPR 449, 459 (2004). (Énfasis suplido). Igualmente, ha establecido que "**la novación en su modalidad extintiva es siempre una cuestión de intención y ésta debe inferirse de las circunstancias que rodean cada caso en particular**." *Íd.,* pág. 459. (Énfasis suplido). Es por ello que, la doctrina puntualiza el elemento de la voluntad de las partes como determinante de la novación. *Íd.,* pág. 459. De manera que, **es un elemento indispensable de la vertiente extintiva el *animus novandi,* es decir, la voluntad expresa de extinguir una obligación por otra.** *PDCM Assoc. v. Najul Bez, supra*, pág. 726. (Énfasis suplido). Ello, ya que la novación "encierra un asunto de intención que debemos inferir de las circunstancias de cada caso y de la voluntad de las partes". *Íd.* En atención a lo anterior, la profesora García Cárdenas sostiene que "**el consentimiento para la novación tiene que ser**

**expreso y claro**". M. GARCÍA CÁRDENAS, DERECHO DE OBLIGACIONES Y CONTRATOS, 133 (MJ Editores 2020). (Énfasis suplido).

Por otro lado, señala el tratadista Carlos Lasarte que, bajo los requisitos de la novación, se requiere:

> **(1)** que la voluntad o intención novatoria de los sujetos no deje lugar a dudas; **(2)** que la voluntad novatoria ha de ser común a ambos sujetos de la obligación y que, por tanto, la novación presupone el acuerdo y la consiguiente capacidad contractual de ambos para contraer una nueva obligación; **(3)** que la obligación primitiva u original sea válida. II, CARLOS LASARTE, DERECHO DE OBLIGACIONES, PRINCIPIOS DE DERECHO CIVIL, 178 (Marcial Pons) (24 ed. 2021).

Como podemos observar, dichos requisitos son cónsonos con nuestro ordenamiento jurídico vigente. Estos preceptos van dirigidos esencialmente a la intención o voluntad de las partes en común acuerdo sobre una obligación. Es decir, dicho requisito es esencial para el cumplimiento de la novación.

*-III-*

La parte apelante acude ante este Tribunal solicitando que revoquemos la *Sentencia Parcial* emitida por el Tribunal de Primera Instancia, por no estar conforme con la determinación del foro primario.

En el primer señalamiento de error señalado el señor Santiago Figueroa señala que el Foro a *quo* erró y al dictar sentencia sumaria en un caso donde se incumplió con varias leyes que dirigen el proceso de ejecución hipotecaria y pérdida de mitigación donde la parte apelada denegó las solicitudes de mitigación, toda vez que no le proveyeron todas las alternativas para evitar la ejecución de su hipoteca. *No le asiste la razón.*

Según el derecho esbozado sobre la RESPA y el Reglamento X, *supra,* y las disposiciones al momento de presentar la demanda, si la parte afectada no ha hecho gestiones de mitigación de pérdidas, el acreedor puede iniciar un proceso judicial. Ahora bien, una vez iniciado el proceso judicial, siempre y cuando no haya advenido una sentencia final y firme, ante una solicitud de

mitigación de pérdidas, que lo fue lo que ocurrió en el caso de marras, el proceso judicial se paraliza.

Posteriormente, el señor Santiago Figueroa desistió de la modificación hipotecaria y fue referido al Departamento de Mitigación de Pérdidas. Transcurrieron varios meses, donde hubo intercambio de comunicación entre las partes hasta que, la parte apelante efectivamente completó la documentación para el proceso de mitigación de pérdidas. **Surge del expediente que la parte apelante atravesó por un proceso de mitigación de pérdidas, donde le ofrecieron la oportunidad de entrar en un período de prueba para una modificación hipotecaria**.

Ulteriormente, para poder completar dicho proceso, era necesario conseguir una carta de subordinación de SBA, cuya responsabilidad le competía a la parte apelante. **Adviértase que, durante todo este proceso, la acción judicial se mantuvo paralizada.** A pesar de haber sido debidamente apercibido de los requisitos y los plazos de vencimiento, el señor Figueroa Santiago no cumplimentó la solicitud por la ausencia de la carta de subordinación de SBA. Ante ello, Oriental procedió a informárselo y a cerrar la solicitud correspondiente de modificación hipotecaria, toda vez que mientras ocurrió este trámite el proceso estuvo paralizado. Se desprende del expediente ante nos, que no hubo un proceso de "dual tracking" ni violación al Reglamento X, ni a la RESPA. *No se cometió el error señalado.*

En el segundo (2) señalamiento de error, la parte apelante aduce que erró el foro de instancia al dictar sentencia sumaria sobre un pleito donde surgió una novación perfeccionada el 26 de julio de 2021. *No le asiste la razón.*

Debemos adelantar que para que la novación se produzca debe ocurrir alguno de los presentes supuestos: "(1) que así se declare expresamente o; (2) que, aunque las partes no lo hayan

declarado, la obligación original y la nueva, sean totalmente incompatibles entre sí". 31 LPRA sec. 9423. Sin embargo, la parte apelante nos invita a tomar como fecha de partida la fecha del 26 de julio de 2021, momento cuando el aceptó la oferta para el proceso de mitigación de pérdidas, que posteriormente no completó al no entregar la carta de subordinación de SBA. Nótese que el carácter de la novación es mandatorio y absoluto, por lo que es forzoso concluir que, ante el incumplimiento de la parte apelante ante los requisitos solicitados por Oriental, no se realizó una novación de la obligación.

Como destacamos en el derecho previamente discutido, no solo tienen que concurrir los requisitos de la novación, también los de un contrato, es decir un contrato es vinculante desde que concurren los siguientes requisitos: (1) consentimiento de los contratantes; (2) objeto determinable y (3) causa lícita. 31 LPRA 6131 y 31 LPRA sec. 6142. **La mera aceptación del primer proceso encaminado a participar de un período de prueba para una modificación hipotecaria no puede ser suficiente para novar una obligación de carácter real, y mucho menos, cuando ella no se completó**. *No se cometió el error señalado.*

En el tercer señalamiento de error, la parte apelante aduce que erró el foro de instancia al dictar sentencia sumaria sobre un pleito donde existen múltiples hechos controvertidos sobre el vencimiento, exigibilidad y cuantía de las sumas reclamadas.

Luego de evaluar la prueba de *novo,* estamos más que convencidos de que no existe controversia de que la parte apelante no rebatió los alegados hechos controvertidos. Por el contrario, la prueba nos persuade de que la parte apelada brindó y procedió conforme a las disposiciones legales de nuestro ordenamiento. Igualmente nos convence de que, según justipreció el Foro de Instancia, tanto en la *Moción de Sentencia Sumaria, la Oposición a*

*la Sentencia Sumaria* y l*a Réplica a Moción en Oposición a Solicitud de Sentencia Sumaria,* Oriental cumplió con los requisitos de la Regla 36 de Procedimiento Civil, *supra.* Pues sabido es que la sentencia sumaria es un mecanismo procesal que tiene como propósito la solución, justa, rápida y económica de los litigios civiles que no contengan controversias genuinas de hechos materiales y que, por lo tanto, no ameritan la celebración de un juicio en su fondo. *Segarra Rivera v. International Shipping Agency, Inc., supra,* pág., 979. *No se cometió el error señalado.*

A tenor con lo anteriormente expuesto, luego de haber realizado un análisis mesurado de la totalidad del expediente ante nos y el derecho aplicable, concluimos que el foro de origen no incidió al disponer el pleito de epígrafe mediante el mecanismo de sentencia sumaria.

### -IV-

Por los fundamentos antes expuestos, los cuales hacemos formar parte de este dictamen, confirmamos *la Sentencia* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones